HEATON-PENINSULAR BUTTON-FASTENER CO. v. EUREKA
SPECIALTY CO. et al.

(Circuit Court of Appeals, Sixth Circuit. October 12, 1896.)

No. 312.

1. PATENTS—CONDITIONAL SALE OF PATENTED MACHINES—PUBLIC POLICY—IN-
FRINGEMENT.
It is competent for the owner of a patent for a machine for fastening buttons
to shoes with metallic fasteners to sell such machines subject to a condition
that they shall be used only with fasteners manufactured by the seller, title
to revert on breach of the condition. Even though the fasteners are not pat-
ented, and the result of the restriction is to give the owners of the machine patent
a monopoly of their manufacture and sale, this does not make the condition
void as in restraint of trade or against public policy. A purchaser of the ma-
chine would be, in effect, a mere licensee, and the use of it by him contrary to
the condition would be, not only a breach of contract, but a violation of the
monopoly, for which an injunction suit would lie. 65 Fed. 619, reversed.
State of Missouri v. Bell Tel. Co., 23 Fed. 539; State v. Delaware & A. Tel. &
Tel. Co., 47 Fed. 633; Id., 2 C. C. A. 1, 50 Fed. 677,—distinguished.

2. SAME—NOTICE OF CONDITION.
In such case it is immaterial that the patent owner sells the machines
through jobbers, and not directly to users, where the machines each bear a
conspicuous metal label, with the condition of the sale inscribed thereon, and
both the jobbers and their vendees have notice thereof.

3. SAME—CONTRIBUTORY INFRINGEMENT.
Where machines for fastening on buttons are sold by the patentee upon the
condition that only the staples manufactured by such patentee (which are not
patented) shall be used therein, the manufacture and sale by another party,
to the users of such machines, of staples which are intended to and can only be
used therein, is a contributory infringement, and will be enjoined. 65 Fed.
619, reversed. Morgan Envelope Co. v. Albany Perforated Wrapping Paper
Co., 14 Sup. Ct. 627, 152 U. S. 425, distinguished.

Appeal from the Circuit Court of the United States for the South-
ern Division of the Western District of Michigan.

This is an appeal from the decree of the circuit court for the Western district of
Michigan sustaining a demurrer filed by the defendants, and dismissing the bill of
the complainant. The averments of the bill are substantially these: The com-
plainant, a corporation of the state of Rhode Island, is, by assignment, the sole
owner of several patents for inventions relating to the art of fastening buttons to
shoes with metallic fasteners. The validity of these patents is not now involved.
The machine embodying these inventions is used exclusively for affixing buttons
to shoes. The complainant and its predecessor in the title to the patents have been
successful in getting them into general use in the shoe trade, and it is alleged that
these machines have wholly superseded every other mode of fastening buttons
to shoes. The object of these patents was to produce a machine wherein the buttons
and staples should be automatically presented to a guide or carrier, having a com-
bined driver and former co-operating therewith; the driver causing the insertion
of the staple through the leather, or other material of the shoe, shaping and forming
the head of the staple, the legs of the staple being clinched upon a suitable anvil.
The principal and earlier of these patents—that of Charles H. Eggleston (No.
293,234)—describes the invention as intended to produce a setting device, "which
can be used conveniently for setting and clinching an ordinary metallic staple,
and have the two prongs of the staple, if desired, in a line at right angles with the
strain on the buttons." The mechanism by which such results are reached in-
cludes a staple chute or raceway, into which wire staples of suitable size are fed,
and automatically conveyed, set, and clinched. The size of the staples to be used
in the machine depends upon the size of the chute or raceway, and this depends
upon the judgment of the manufacturer of the machines. No staple can be used

in the machine which is not adapted in size to this raceway, and a variation of a very slight character between the staple and the diameter of the raceway will prevent the operativeness of the machine. The bill alleges that neither the complainant nor its predecessors in title have ever sold any right to manufacture machines, but have reserved to themselves the monopoly of the manufacture and sale. It also alleges that no machines have ever been sold except upon condition, and that there is attached to each machine a conspicuous metal plate, on which is plainly expressed a restriction upon the use of the machine, to the effect that the machine was sold and purchased "to use only with fasteners" made by the complainant, or the Peninsular Novelty Company, predecessors in title to the patents embodied in the machine, and that title should revert at once upon any violation of this restriction. Every user of the machine is alleged to have had full notice of this restriction upon the use of the machines, and to buy and use the machines subject to this restriction upon their use. These machines have been placed in the hands of shoe dealers, to the number of 49,000, at the actual cost of the machines to the makers, they expecting a profit on their monopoly alone from the sale of fasteners or staples to those having the machine. Complainant then alleges that the defendants, with full knowledge of this method of putting complainant's monopoly in general use, are making and selling staples adapted only to use with these machines, and that they are guilty of infringement, by reason of the fact that the staples so made and sold by them are adapted only to use in these machines, and are made and sold with intent that they shall be used in violation of the restriction placed by complainant upon the use of machines made and sold by it. It is further charged, in very broad and emphatic terms, that defendants maliciously persuade and induce the licensees of said machines to buy and use said staples on their machines, and to thus deliberately and continuously violate the restriction placed upon the use of the machine. It is not charged that the defendants either make, sell, or use said machines, but that they are guilty of contributory infringement, by inducing others to use the machine in excess of the license, and by furnishing them with the means for such infringement, with the express intent that the staples so sold and bought shall be so used.

Frederick P. Fish and James H. Lange, for appellant.

Arthur C. Denison, for appellees.

Before TAFT and LURTON, Circuit Judges, and HAMMOND, J.

After the foregoing statement, the opinion of the court was delivered by LURTON, Circuit Judge.

Staples in size and form adapted to use in such machines are unpatented articles, and not even an element in a combination claim. They are therefore no more within the direct monopoly of the patents than are the buttons to be affixed by means of the staples, or the shoe to which both are to be attached. This conceded fact furnishes the foundation for the principal objection to the bill presented by the demurrer. It has been very earnestly and ably argued by counsel for appellees that the restrictions on use imposed by the complainant operate to create a monopoly in an unpatented article, and are therefore void as contrary to public policy, or, if valid as purely legal contracts, are so unconscionable as not to entitle complainant to equitable remedies for their enforcement. This view seemed to meet with the approbation of the learned judge who heard the case below, who, in his opinion, said that he "was persuaded that the patentee's privilege has its limits, in the rights and interests of the public, and that it is an abuse of his privilege to so shape his dealings with his patent as to secure a monopoly upon an unpatented article." This presents a question somewhat novel, and of wide general interest. The restriction imposed by the Peninsular Novelty Company, the assignors under

whom complainant holds, was inscribed upon a metal label affixed to each machine, and was in these words:

"Condition of Sale."

"This machine is sold and purchased to use only with fasteners made by the Peninsular Novelty Company, to whom the title to said machine immediately reverts upon violation of this contract of sale."

The bill further charges that the complainant corporation has succeeded to all the patents, property rights, titles, contracts, and contract rights of the Peninsular Novelty Company, and has continued the manufacture and sale of button-fastener machines under conditions and restrictions identical in terms and notoriety with the methods pursued by the predecessor company. If we, for the present, assume the legality of the conditions and restrictions imposed upon the purchasers of such machines, it is highly important to an orderly disposition of other questions that we shall, at the outset, determine whether the purchasers of the machines made and sold under complainant's patents are guilty of any infringement of the monopoly of the patents by using with such machines fasteners or staples not made by the patentee. Undoubtedly, the general rule is that if a patentee make a structure embodying his invention, and unconditionally make a sale of it, the buyer acquires the right to use the machine without restrictions, and, when such machine is lawfully made and unconditionally sold, no restriction upon its use will be implied in favor of the patentee. By such unconditional sale the machine passes without the limit of the monopoly. Adams v. Burke, 17 Wall. 453–457; Mitchell v. Hawley, 16 Wall. 544–547. That the complainant has attempted to state a case not within this rule is very obvious, for it charges that every sale has been under an express restriction as to the use of the invention embodied in the machine. In view of the conspicuous character of both the machine and the notice permanently affixed thereon, every one buying must be conclusively presumed to have notice that the owners of the patents intended by the inscription on the machine to grant only a restricted license for its use, and it is difficult to see why such purchaser is not to be regarded as acquiring and accepting the structure subject to this restriction. The buyer of the machine undoubtedly obtains the title to the materials embodying the invention, subject to a reverter in case of violation of the conditions of the sale. But, as to the right to use the invention, he is obviously a mere licensee, having no interest in the monopoly granted by the letters patent. A license operates only as a waiver of the monopoly as to the licensee, "and estops the licensor from exercising its prohibitory powers in derogation of the privileges conferred by him upon the licensee." Rob. Pat. §§ 806–808. It has been said that the sole matter conveyed in a license is the right not to be sued. Hawks v. Swett, 4 Hun, 146. A licensee is one who is not the owner of an interest in the patent, but who has, by contract, acquired a right to make or use or sell machines embodying the invention. Gaylor v. Wilder, 10 How. 477; Oliver v. Chemical Works, 109 U. S. 75, 3 Sup. Ct. 61; Rob. Pat. §§ 606–608. All alienations of a mere right to use the invention operate only as licenses. It must follow, therefore, that the purchaser of one of complainant's machines subject to a restricted

use takes the structure with a license to use the invention only with staples made by the patentee. That the complainant sells the machine through jobbers, and not directly to those who buy for use, is immaterial, under the facts stated on the face of the bill. The jobber buys and sells subject to the restriction, and both have notice of the conditional character of the sale, and of the restriction on the use. Supply Co. v. Bullard, 17 Blatchf. 160, Fed. Cas. No. 294; Cotton-Tie Co. v. Simmons, 106 U. S. 89, 1 Sup. Ct. 52. That the buyer enters into an implied agreement that he will not use the machine contrary to the terms of his license, and that there is in the agreement a provision for a reverter of the title to the structure, may operate to give the patentee a remedy under general principles of law, as for damages for a breach of contract, or for recovery of the machine. It may be that a suit for a breach of contract would not be a suit depending on the patent laws, and would therefore be cognizable by the state courts, as intimated in Hartell v. Tilghman, 99 U. S. 547, and White v. Rankin, 144 U. S. 628, 12 Sup. Ct. 768. The remedy of complainant may be a double one; for liability may rest either upon the broken contract, or for the tortious use of the invention. Rob. Pat. §§ 1225–1250, and notes. If a patentee may lawfully make and sell machines embodying his invention, and restrict the use of the invention in respect of territory or time or business, or purposes to which it may be put, or material to be used in conjunction therewith, it would seem very obvious that the effect of the restrictions and limitations on the use would operate to prevent the machine from passing, as in the case of an unconditional sale, beyond the monopoly of the patent. The control reserved by the patentee as to the use of the machine has the effect of continuing it within the prohibition of the monopoly. The license defines the boundaries of a lawful use, and estops the licensor from the assertion of his monopoly contrary to its terms. On the other hand, a use prohibited by the license is a use in defiance of the monopoly reserved by the patentee, and necessarily an unlawful invasion of the rights secured to him by his patent. The license would be no defense to a suit for infringement by a use in excess of its terms. The patentee has the exclusive right of use, except in so far as he has parted with it by his license. The essence of the monopoly conferred by the grant of letters patent is the exclusive right to use the invention or discovery described in the patent. This exclusive right of use is a true and absolute monopoly, and is granted in derogation of the common right, and this right to monopolize the use of the invention or discovery is the substantial property right conferred by law, and which the public is under obligation to respect and protect. "The right to make and use, or sell, are completely severable rights, and involves the right to confer on others such qualified privilege, whether of making, of selling to others, or of using, as he sees fit, whether within specified limits, or under limitations of quantity or numbers or restricted use." Dorsey Revolving Harvester Rake Co. v. Bradley Manuf'g Co., 12 Blatchf. 202, Fed. Cas. No. 4,015. In Adams v. Burke, 17 Wall. 453–456, the court said, "The right to manufacture, the right to sell, and the right to use, are each substantive rights, and may be granted separately or conferred together by the patentee."

If, then, the patentee has the exclusive right to the use of his invention or discovery, during the term of his patent, it would seem to follow that any use by another, unauthorized by the patentee, would be an infringement of his monopoly. If, therefore, he can find a purchaser for a machine subject only to certain specified uses, any violation of the privilege granted would be an infringement, for which the remedies granted patentees would be appropriate. These conclusions find support in many cases. A few only need be cited: In Rubber Co. v. Goodyear, 9 Wall. 788–790, the defense to a suit for infringement was a license which authorized the licensee "to use the said Goodyear's gum-elastic composition for coating cloth for the purpose of japanning, marbling, and variegate japanning, at his own establishment, but not to be disposed of to others, * * * and not being intended to convey any right to make any contract with the government of the United States." The licensee was held guilty of infringement by allowing it to be used at an establishment occupied by himself and others, and also by using it for articles manufactured for the United States under a contract with the quartermaster general. In Burr v. Duryee, a case decided by Justice Grier on circuit, and reported as Fed. Cas. No. 2,190, the license was to use two machines "in the city of Newark, and there only," and "by one manufacturing concern," "to be used only for hats manufactured by them, and not in manufacturing hat bodies for any other persons, or for sale in an unfinished state." Any use beyond the license was held to be infringement. The license in Manufacturing Co. v. Owsley, 27 Fed. 100–104, was to use certain patents pertaining to improvements in bicycles. Judge Blodgett, in passing upon the scope and effect of the license, said:

"The licenses do not, any of them, purport to give the defendants an unlimited use of any of the patents, but only a restricted right to make machines of certain sizes and descriptions; so that, when defendants made machines not in conformity to the licenses, they violated, not only their express covenant not to do so, but also the complainant's patents, or some of them, covering such machines."

In Steam Cutter Co. v. Sheldon, 5 Fish. Pat. Cas. 477–487, Fed. Cas. No. 13,331, the license was to use one machine "in their quarries at West Rutland, and in no other place or places." The licensee permitted the use of the machine in another quarry by a third person. Judge Woodruff said:

"In that infringement of the rights of the complainants, the defendants find no defense in the agreement. They are, with the Rutland Marble Company, joint infringers."

See, also, the very satisfactory text of Rob. Pat. §§ 812–815, 1250, and the notes, citing many other cases.

This brings us to consider the objections urged against the rather novel restrictions contained in the licenses granted by complainant. The very able counsel for appellees have urged very forcibly an argument based upon principles of public policy in respect of monopolies and contracts in restraint of trade, and have contended that public policy forbids a patentee from so contracting with reference to his monopoly as to create another monopoly in an unpatented article. We are not at all prepared to say that there are no limita-

tions upon a patentee's power of contract with reference to the use of his invention by others. The property right of a patentee is, after all, but a property right, and subject, as is all other property, to the general law of the land. We may also concede that contracts respecting the use of inventions and discoveries are, like all other contracts, subject to the limitations imposed by definite principles of public policy. The cases of State of Missouri v. Bell Tel. Co., 23 Fed. 539; State v. Delaware & A. Tel. & Tel. Co., 47 Fed. 633; Id., 2 C. C. A. 1, 50 Fed. 677,—afford illustrations of a limitation, founded on principles of public policy, upon the licenses granted by patentees. They arose under licenses granted by the owners of patents essential to the operation of telephone lines. The patentees had licensed telephone companies to use their patents for the purpose of operating public telephone lines within a given district, but prohibited such companies from serving, within such district, any telegraph company. The court in each of the cases cited, by mandamus, compelled the extension of service to any one within the district demanding connection and paying established charges. These decisions were rested upon the very solid ground that a public telephone company was a "common carrier," and, as such, subject to the regulations imposed on all corporations of a quasi public character, among which was the duty of dealing equally with all, and discriminating against none, tendering equal pay for equal service. The conclusion to be drawn from these telephone cases is this: That when a patentee authorizes the use of his invention by one charged with public duties, and subject to regulation by law, it is not competent, by a restriction on the use, to deprive the licensee of the power of rendering an equal service to all who apply and tender the compensation fixed by law or regulation for the same service to others. The patentees were under no obligation to license the use of their inventions by any public telephone company. Having done so, however, they were not at liberty to place restraints upon such a public corporation which would disable it from the discharge of all the duties imposed upon companies engaged in the discharge of duties subject to regulation by law. It could not be a public telephone company, and could not exercise the franchise of a common carrier of messages, with such exceptions in the grant; the exception, being repugnant to the grant, was void; and the rights acquired under the grant were enforced against the grantor, without regard to the exception or condition. Neither the patentee, nor the machine involving his invention, nor a license for use, can be exempted from the liabilities and regulations which, in the public interest, attach to all persons and property under the general law of the land. Neither is the right to make and sell or use a patented invention or process free from the restraints imposed by the police power of the states. This is illustrated by the case of Patterson v. Kentucky, 97 U. S. 501, where the appellant had been convicted of selling an improved burning oil, of which he was the inventor, and which had been condemned by the state inspector as unsafe, but which the appellant claimed the right to sell by reason of the monopoly of his

patent. The supreme court, through Mr. Justice Harlan, in reply to this contention, said:

"The right which the patentee or his assignee possesses in the property created by the application of a patented discovery must be enjoyed subject to the complete and salutary powers, with which the states have never parted, of so defining and regulating the sale and use of property within their respective limits as to afford protection to the many against the injurious conduct of the few."

On substantially the same ground it was decided in Vannini v. Paine, 1 Har. (Del.) 65, that the patentee of a mode of drawing lotteries, and engaged in the business of drawing lotteries in the state of Delaware, was not protected by his patent from prosecution under the law of Delaware making the drawing of a lottery a criminal offense. In other words, a prohibited business is not protected by the patent laws of the United States because it is conducted through instrumentalities, the subject of patent rights.

The case at bar presents no question affected by the principles underlying either of the class of cases we have cited. What we are asked to do is to mark another boundary line around the patentee's monopoly, which will debar him from engrossing the market for an article not the subject of a patent. To do this, we are asked to say that he cannot license others to use his invention on condition that they shall use it only in conjunction with a nonpatentable article made by himself. The only reason suggested for this limitation upon his right to define the terms upon which others may use his invention is that a monopoly in the unpatented article may thereby be created. Upon what authority are we to circumscribe the exercise of the privileges awarded a patentee? In considering any question in respect of restraints upon the liberty of contracting, imposed by principles of public policy, we should bear in mind that very high considerations of public policy are involved in the recognition of a wide liberty in the making of contracts. This caution was well expressed by Sir George Jessell in Registering Co. v. Sampson, L. R. 19 Eq. 462–465, who said:

"It must not be forgotten that you are not to extend arbitrarily those rules which say that a given contract is against public policy, because, if there is one thing which, more than another, public policy requires, it is that men of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts, when entered into freely and voluntarily, shall be held sacred, and shall be enforced by courts of justice. Therefore you have this paramount public policy to consider,—that you are not lightly to interfere with this freedom of contract."

Especially is this caution applicable when we sit in judgment upon the limitations which a patentee may put upon the use of his invention. If he see fit, he may reserve to himself the exclusive use of his invention or discovery. If he will neither use his device, nor permit others to use it, he has but suppressed his own. That the grant is made upon the reasonable expectation that he will either put his invention to practical use, or permit others to avail themselves of it upon reasonable terms, is doubtless true. This expectation is based alone upon the supposition that the patentee's interest will induce him to use, or let others use, his invention. The public has retained no other security to enforce such expectations. A sup-

pression can endure but for the life of the patent, and the disclosure he has made will enable all to enjoy the fruit of his genius. His title is exclusive, and so clearly within the constitutional provisions in respect of private property that he is neither bound to use his discovery himself, nor permit others to use it. The dictum found in Hoe v. Knap, 27 Fed. 204, is not supported by reason or authority. Wilson v. Rousseau, 4 How. 674; Pitts v. Wemple, 1 Biss. 93, Fed. Cas. No. 11,194; Grant v. Raymond, 6 Pet. 218; U. S. v. American Bell Tel. Co., 29 Fed. 17; Consolidated Roller-Mill Co. v. Coombs, 39 Fed. 805; Campbell Printing-Press Co. v. Manhattan Ry. Co., 49 Fed. 935. If the patentee choose to reserve to himself the exclusive use of his device, and the invention be of a wide character, and so radical as to enable him to make and sell an unpatentable product cheaper than any other competitor, a practical monopoly of the market for that article will result; and yet no one could say that a monopoly thus secured was illegitimate, or obnoxious to public policy. To illustrate: Let it be supposed that the patents owned by this complainant were of so wide a character as to cheapen the process of manufacturing shoes, and to drive from competition all other modes of manufacture. Then suppose the patentees were of opinion that they could most profitably enjoy their inventions by retaining the monopoly of the use, and engaging in the manufacture of shoes. If content to undersell all others, they could engross the market for shoes, to the extent of their capacity to supply the demand during the life of their patents, or so long as their invention was not superseded by subsequent inventions still further cheapening the cost of manufacture. The monopoly thus secured would be the legitimate consequence of the meritorious character of their invention. Yet just such monopolies may result whenever a new and surprising advance is made in some art of wide and general use. The great consuming public would be benefited, rather than injured, for the monopoly could endure so long only as shoes were supplied at a less price than had prevailed before the invention. Now, if the patentees, by retaining to themselves the exclusive use of their invention, are able, legitimately and lawfully, to acquire a monopoly of the manufacture of shoes, and destroy the shoe market for those who before had shared it, why may they not, by a system of restricted licenses, permit others to use their devices on condition that only some minor part of the shoe,—the pegs, the tips, the thread, or the buttons, or the button fasteners,—shall be bought from them? If these concessions were such as to enable others to compete, though their use of the mechanism was restricted by the terms of the license, who could justly complain, if the inventors, content with a monopoly of the market for the article named in their license, surrendered the opportunity for a monopoly of the manufacture of the complete shoe? The device protected by the patents owned by complainant is of no such wide or radical character as that used for purposes of illustration. Yet there is no appreciable difference in the legal principles applicable to the supposed facts used for illustration, and those stated on the face of the complainant's bill. The fact which has affected the makers of wire staples for shoe manufacturing is the in-

vention of a machine which, by its simplicity, superior capabilities, its cheapness and accuracy, has practically driven all other methods of fastening buttons to shoes out of use. The older and clumsier methods, on the allegations of the bill, have been completely superseded. From this invention there results a large market for wire staples, adapted in size and shape to use with the new mechanism, and a second consequence is the complete cessation of the demand for button fasteners not adapted to be used with complainant's machine. To supply staples adapted to meet this new demand becomes a matter of moment to those engaged in the business of making wire button fasteners. The inventions covered by complainant's patents are not of such character as to enable them, by retaining the exclusive use, to absorb either the making of shoes, or the minor work of fastening buttons to shoes. In the exercise of the right of exclusive use, they have put on the market a structure embodying their devices, and licensed the purchaser to use the invention "only with staples" made by themselves. In other words, they have chosen to fix the price for the right of use at the profit resulting from the sale of staples. As observed by counsel for complainant, "The fasteners are thus made the counters by which the royalty proportioned to the actual use of the machine is determined." This method of licensing their mechanism may or may not result in the engrossment of the market for staples. So long as their invention controls the market for button-fastening appliances, and to the extent that their machines shall supersede other modes of clinching staples, just so long will they be enabled to control the market for staples. Their monopoly in an unpatented article will depend upon the merit of their patented device, and the extent to which other clinching devices are superseded by it. In the last analysis, the invention destroyed the demand for sizes and shapes of staples not adapted to use with the machine of complainant, and the monopoly of the use awarded by the patents destroyed the market for staples fitted for use in complainant's machines. The monopoly in the unpatented staple results as an incident from the monopoly in the use of complainant's invention, and is therefore a legitimate result of the patentee's control over the use of his invention by others. Depending, as such a monopoly would, upon the merits of the invention to which it is a mere incident, it is neither obnoxious to public policy, nor an illegal restraint of trade.

If we are right in the foregoing conclusions that the users of Peninsular machines, who use therein the button fasteners made and sold by the defendants, thereby infringe the patents for inventions embodied in said machines, it would seem to follow that the defendants, who aid and abet such infringement by intentionally and maliciously persuading and inducing the licensees of such machines to exceed their licenses, and by furnishing them with the means for such infringement are themselves infringers, and liable as tort feasors. The allegations of the bill in this regard are very full and emphatic. Beginning with the distinct averment that there is no market for fasteners adapted in size and shape for use in complainant's structure, except in connection with those structures, it is then

charged that defendants actively induced the users of such machines to infringe, by persuading them that they may use defendants' fasteners with impunity, and that they, with the malicious purpose of causing them to violate their licenses, furnish them with the means necessary to that end. Thus, through a concert of action between defendants and complainant's licensees, the patents are infringed, and all engaged directly and intentionally become joint infringers. It is the knowledge that the staples made and sold by defendants are to be used for the purpose of infringing, coupled with the active intent that they shall be so used, which, in a case like this, constitutes contributory infringement. Under the circumstances alleged, it is immaterial that defendants do not themselves use the Peninsular machines, and equally immaterial that they are engaged in the business of making and selling an unpatentable article which is not even an element in a combination patent. The facts of this case may make an unusual mode of infringing, but the principle applicable is quite well established. If the licensees infringe, all who actively and intentionally aid and abet them in infringing are equally infringers. The intent characterizes the conduct of defendants, and is essential to make a case against them. The principle governing infringement of combination patents by furnishing a necessary element in the combination is applicable to the case at bar. To make or sell a single element may be quite an innocent act, for a combination is not infringed except by uniting all of the necessary elements. But "to make or sell a single element with the intent that it shall be united to the other elements, and so complete the combination, is infringement." Rob. Pat. § 924, and cases cited. Judge Shepley stated the rule quite clearly in Saxe v. Hammond, 1 Ban. & A. 629–632, Fed. Cas. No. 12,411, when he said:

"Different parties may all infringe by respectively making or selling, each of them, one of the elements of a patented combination, provided those separate elements are made for the purpose and with the intent of their being combined by a party having no right to combine them. But the mere manufacture of a separate element of a patented combination, unless such manufacture be proved to have been conducted for the purpose and with the intent of aiding infringement, is not, in and of itself, infringement."

The case of Wallace v. Holmes, 9 Blatchf. 65, Fed. Cas. No. 17,100, is a leading case illustrating the rule we deem here applicable. The complainants had a patent for an improved burner, in combination with a chimney. The defendants made and sold the burners alone, leaving the purchaser to supply the chimney, without which the burner was useless. This was done for the express purpose and with the intent of making a profit through an infringement of the complainants' patent. The rule of law invoked by the defendants was this:

"That, where a patent is for a combination merely, it is not infringed by one who uses one or more of the parts, but not all, to produce the same results, either by themselves, or by the aid of other devices."

To this the the court responded as follows:

"But I am not satisfied that this rule will protect the defendants. If, in actual concert with a third party, with the view to the actual production of the patented improvement in lamps, and the sale and use thereafter, they consented to manu-

facture the burner, and such other party to make the chimney, and in such concert they actually make and sell the burner, and he the chimney, each utterly useless without the other, and each intended to be used, and actually sold to be used, with the other, it cannot be doubtful that they must be decreed to be joint infringers of the complainants' patent. It cannot be that, when a useful machine is patented as a combination of parts, two or more can engage in its construction and sale, and protect themselves by showing that, though united in an effort to produce the same machine, sell, and bring it into extensive use, each makes and sells one part only, which is useless without the other, and still another person, in precise conformity with the purpose in view, puts them together for use. If it were so, such patents would indeed be of little value. In such cases all are tort feasors, engaged in a common purpose to infringe the patent, and actually, by their concerted action, producing that result. * * * Here the actual concert with others is a certain inference from the nature of the case, and from the distinct efforts of the defendants to bring the burner in question into use, which can only be done by adding the chimney. The defendants have not, perhaps, made an actual prearrangement with any particular person to supply the chimney to be added to the burner, but every sale they make, is a proposal to the purchaser to do this, and his purchase is a consent with the defendants that he will do or cause it to be done. The defendants are therefore active parties to the whole infringement, consenting and acting to that end, manufacturing and selling for that purpose."

There are many other cases in accord with those from which we have made extracts, a few of which are Holly v. Machine Co., 18 Blatchf. 327, 4 Fed. 74; Travers v. Beyer, 26 Fed. 450; Willis v. McCullen, 29 Fed. 641; Alabastine Co. v. Payne, 27 Fed. 559; Celluloid Manuf'g Co. v. American Zylonite Co., 30 Fed. 437; Boyd v. Cherry, 50 Fed. 279; Supply Co. v. McCready, 4 Ban. & A. 588, Fed. Cas. No. 295.

Morgan Envelope Co. v. Albany Perforated Wrapping Paper Co., 152 U. S. 425, 14 Sup. Ct. 627, has been much relied upon by the defendants. The claim of the patent involved was for a combination of a mechanism for the delivery of paper, to be delivered as used, with a paper roll, the subject of an independent patent. The infringement charged consisted "in selling oval rolls of paper of their own manufacture, with fixtures manufactured and sold by the plaintiffs, in combination with their paper, to persons other than the defendants, the fixtures having been obtained by the defendants from the original purchasers of the patented combination, and also by selling oval rolls of paper of defendants' own manufacture to persons who had previously purchased fixtures and paper from the plaintiffs, with the knowledge and intention that the paper so sold was to be used in connection with the plaintiffs' fixtures." It also appeared that it had not been the practice of the plaintiffs to sell fixtures independently of its paper, and that they sold only to such parties as dealt in and used their paper. "Purchasers were also required to buy a given quantity of paper to a given number of fixtures, to be sold only in connection with the paper, the rule being not to sell more than one fixture to one case of paper. The fixtures were also sold to hotels and other public buildings, with the understanding that their paper would be subsequently purchased of the plaintiff company." The court adds that "it appears to have been its invariable rule to refuse to sell its fixtures except to persons also ordering paper." No question was made as to the novelty of the mechanism employed as a fixture for the delivery of paper as desired by the user.

The independent patent on the paper roll was held void for want of patentable novelty. This left for decision the question as to whether the sale by defendants of old mechanisms made by complainant, with paper made by defendants, or the sale by defendants of paper made by themselves for use in fixtures bought from complainant, was infringement. Upon the first point the court, through Justice Brown, said:

"So far as fixtures sold by defendants, which had been originally manufactured and sold by the patentee to other parties, are concerned, it is evident that, by such original sale by the patentee, they passed out of the limits of the monopoly, and might be used or sold by any one who had purchased them from the original vendees. The patentee having once received his royalty upon such device, he cannot treat the subsequent seller or user as an infringer. Bloomer v. McQuewan, 14 How. 539. As was said by Mr. Justice Clifford in Chaffee v. Belting Co., 22 How. 217–223: 'When the patented machine rightfully passes to the hands of the purchaser from the patentee, or from any other person authorized to convey it, the machine is no longer within the limits of the monopoly. * * * By a valid sale and purchase, the patented machine becomes the private individual property of the purchaser, and is no longer protected by the laws of the United States, but by the laws of the state in which it is situated.' See, also, Bloomer v. Millenger, 1 Wall. 340; The Paper-Bag Cases, 105 U. S. 766, 771. In this latter case, one Morgan had purchased a machine for making paper bags of the patentee; and it was held that, having the absolute ownership of the machine, he had the right either to use it during the existence of the letters patent, or to transfer such ownership and right to another. It was said that 'the power to sell the machine and transfer the accompanying right of use is an incident of unrestricted ownership.' Birdsell v. Shaliol, 112 U. S. 485, 5 Sup. Ct. 244; Woodworth v. Curtis, 2 Woodb. & M. 524, Fed. Cas. No. 18,013; Goodyear v. Rubber Co., 1 Cliff. 348, Fed. Cas. No. 5,557."

With respect to the second question the court said:

"The real question in this case is whether, conceding the combination of the oval roll with the fixture to be a valid combination, the sale of one element of such combination, with the intent that it shall be used with the other element, is an infringement. We are of opinion that it is not. There are doubtless many cases to the effect that the manufacture and sale of a single element of a combination, with intent that it shall be united to the other elements, and so complete the combination, is an infringement. Saxe v. Hammond, Holmes, 456, Fed. Cas. No. 12,411; Wallace v. Holmes, 9 Blatchf. 65, Fed. Cas. No. 17,100; Barnes v. Straus, 9 Blatchf. 553, Fed. Cas. No. 1,022; Schneider v. Pountney, 21 Fed. 399. But we think these cases have no application to one where the element made by the alleged infringer is an article of manufacture perishable in its nature, which it is the object of the mechanism to deliver, and which must be renewed periodically, whenever the device is put to use. Of course, if the product itself is the subject of a valid patent, it would be an infringement of that patent to purchase such product of another than the patentee; but, if the product be unpatentable, it is giving to the patentee of the machine the benefit of a patent upon the product, by requiring such product to be bought of him. To repeat an illustration already put: If a log were an element of a patentable mechanism for sawing such log, it would, upon the construction claimed by the plaintiff, require the purchaser of the sawing device to buy his logs of the patentee of the mechanism, or subject himself to a charge of infringement. This exhibits, not only the impossibility of this construction of the patent, but the difficulty of treating the paper as an element of the combination at all. In this view, the distinction between repair and construction becomes of no value, since the renewal of the paper is, in a proper sense, neither the one nor the other."

It is true that Mr. Justice Brown, in discussing the question involved in that case, assumes that a combination of the machine for delivering the paper with the paper to be delivered was valid. But before he finishes the argument he shows that the assumption leads

to an absurdity, and the decision, in effect, is that form of argument known as the "reductio ad absurdum," establishing that his original assumption was not founded in reason. The illustration of the result of such a combination shows that what the court was deciding was that a combination of the machine was an unpatentable paper or material to be operated upon by the machine was an impossibility, and the sale of the machine involved and implied the right of use of the material with which it was to be combined; and this is shown by the case of Wilson v. Simpson, 9 How. 109, which is cited by Mr. Justice Brown as a case sustaining his conclusion. That case was a suit for infringement against the purchaser of a patent machine for planing wood, in which there were claims for the combination between the rest of the machine and certain knives necessary to its operation. The alleged infringer had made or bought knives to replace the knives in the machine, which had worn out, and which it was shown must necessarily wear out and be renewed long before the main body of the machine would wear out. It is held that the conveyance of the machine itself, with the knives in it, implied the right on the part of the purchaser to renew or replace the knives necessary for the enjoyment and use of the whole machine during its natural life. Thus, with respect to the paper holder, the supreme court, in effect, held that the sale of the paper fastener with the paper in it contained the implication of a right to renew the right when that paper sold should be exhausted, and did not require the purchase of the paper from the original patentee, the paper itself not being patented. In the case at bar the purchaser expressly agreed, by contract, that his right to use the machine should not extend beyond its use with staple fasteners furnished by the patentee, and this makes the broad distinction between the Morgan Envelope Co. Case and the case at bar.

The suggestion has been made that, although defendants may be guilty of infringement, complainant's remedy at law is adequate, and, under the circumstances of the case, equity ought not to accord to the patentee the equitable relief of injunction. As to this aspect of the case, it would seem clear that, if complainant has imposed a legal restriction upon the use of the inventions embodied in the structures made and sold by it, the remedy at law is wholly inadequate, and relief by injunction should be awarded upon the case stated in the bill. As to this the court below seemed to entertain no serious doubt; for Judge Severens, in replying to the suggestion that as defendants were not engaged in the use of complainant's machines, and were only concerned "in selling, to those who were so employed, a nonpatented article,—an article constituting no part of the patented thing,—were not, therefore, accountable to the complainant," said:

"I am not clear, however, that this distinction can be maintained upon the allegations of this bill, which are very broad and emphatic in asserting, not merely that the defendants make and sell the staples, but that they actively persuade the users of the machine to violate the supposed rights secured to the complainant by the patent, and the restriction in the sale of its machines. It would rather seem that, if the complainant has such rights as it asserts, the defendants would, upon such facts, be tort feasors, and that equity would restrain them, in the circumstances alleged." 65 Fed. 620.

The bill discloses that more than 49,000 machines are in use, and charges a long-continued infringement, and a purpose to continue therein. Under such circumstances, it must be evident that, both upon the ground of avoiding a multiplicity of lawsuits, and upon the general and apparent inadequacy of a suit at law for damages, either against the infringer who infringes by an unauthorized use, or those who actively contribute to that infringement, a court of equity has jurisdiction. An action at law for the character of continuing trespass alleged by complainant would be grossly inadequate to protect the patents from invasion. If the complainant has the right to reserve a control over the use in the manner stated in its bill, then its machines, to the extent it has reserved such control, are within the monopoly of the patents. If its licenses do not infringe public policy, but are within the privileges awarded by the patents, then it must follow that the case presented should be accorded relief by injunction restraining the acts complained of. A court of equity has the power, independently of any other relief, to restrain the continuing infringement of a patent. Supply Co. v. McCready, Fed. Cas. No. 295. The decree must be reversed, and the cause remanded, with directions to overrule the demurrers.