198

SWAN, Circuit Judge, dissenting.

———◆———

Samuel E. Darby, Jr., of New York City
(Virgil E. Woodcock, of Philadelphia, Pa.,
of counsel), for appellant.

R. Morton Adams and Pennie, Edmonds,
Morton & Barrow, all of New York City
(W. B. Morton, Jr., of New York City, of
counsel), for appellee.

Before L. HAND, SWAN, and FRANK,
Circuit Judges.

L. HAND, Circuit Judge.

This is an appeal from a judgment, dismissing the plaintiff's complaint for a declaratory judgment, and directing it to assign eleven patents to the defendant. The
parties are corporations organized under
the laws of different states, and in the
spring of 1944 they had come to a critical
difference as to the effect of a contract, entered into between them on June 23, 1937.
The defendant, on April 29, 1944, elected
to terminate this contract as of the following May 10th, and thereby raised the
question which the plaintiff wishes to have
determined in this action. The facts are
as follows. The defendant was the owner
of three patents taken out in 1935 and 1936,
upon the invention of one, Walter R.
Zwoyer: the first, upon an original application, filed on November 28, 1933; the
other two, upon divisional applications of
the original. They were all for a machine
to make a connected series of small transparent envelopes and to fill them with small
pellets, such as pieces of hard candy and
the like. The machine proved a success,
and the defendant began making and selling
it under the name, "Transwrap Packing
Machine." The plaintiff had been engaged
in the business of making machinery to
make and fill similar packages with powders
—for the most part toilet powders—and in
1935 it learned of the Zwoyer patents, and
sought a license under them early in 1936.
After preliminary negotiations not necessary to set forth, the parties executed the
contract of June, 1937, out of which the
present controversy arises, and the substance of which was as follows.

The defendant granted to the plaintiff
an exclusive license under the Zwoyer
patents in the United States, Canada and
Mexico, as well as upon any patents for
improvements which it might secure during
the life of the contract. The plaintiff promised to keep books and render accounts,
and to pay royalties, fixed by elaborate provisions not relevant here. The defendant
promised to communicate to the plaintiff

what it knew about manufacturing the machines and about prospective customers and the like, and to use its best efforts to push the sales under the patents. The contract was to last for ten years unless terminated as provided; but the plaintiff had an option to renew it for successive periods of five years, "until the expiration of the Patents above referred to and the expiration of any further Patents that may be granted to or acquired by the Licensor or Licensee, covering improvements in Transwrap Packaging Machines or inventions used, or capable of use by the Licensee in the manufacture thereof." This option was contingent (1) upon notice to the defendant, (2) upon prior performance by the plaintiff of all the conditions of the contract, and (3) upon the fact that "the volume of sales of Transwrap Packaging Machines during the then current term of the license has been such as should reasonably be satisfactory to the Licensor." In the event of disagreement as to whether sales had been reasonably satisfactory, that question was to be settled by arbitration. The defendant promised to sell the plaintiff such of its manufacturing apparatus used in making the machines as the plaintiff wished, for which the plaintiff was to pay prices as should be agreed; also to sell such of the machines and parts of machines already manufactured, as the plaintiff wished. In case the contract was terminated before the ten years expired, the defendant promised to buy back this apparatus and these machines, and any apparatus and machines meanwhile made by the plaintiff, at a depreciation of twenty per cent. The parties agreed not to challenge the validity of the Zwoyer patents, and there were stipulations regarding the suits for infringement, and the like.

So far, the contract was concededly unobjectionable. The contest is as to the eleventh, twelfth, and fourteenth Articles, which are quoted in the margin,* and the important parts of which were as follows. Article XI is obscure, but we read the second sentence as meaning that the plain-

* "11. During the term of this license all improvements to Transwrap Packaging Machines, or new inventions used or capable of use in connection therewith, whether made by the Licensor or by the Licensee, shall be deemed included within the terms of this license, without any additional consideration, or license fee or royalty being due to the Licensor for the use thereof. It is understood and agreed, however, that the Licensor shall have the right to use, and license the use of, outside the several territories covered by this License Agreement, any improvement or addition to Transwrap Packaging Machines or any new inventions connected with such machines and used in making and/or closing the package, but not those applying to the filling or to the contents of the package, made, owned or controlled by the Licensee, but such right to use and enjoy such Patents or inventions shall be exclusive only with regard to their use in Transwrap Packaging Machines and Licensee shall have the free right to use and enjoy them in all other fields and in all other kinds and types of machines without the payment of any royalty to Licensor for such use."

"12. If the Licensee shall discover or invent an improvement which is applicable to the Transwrap Packaging Machine and suitable for use in connection therewith and applicable to the making and closing of the package, but not to the filling nor to the contents of the package, it shall submit the same to the Licensor, which may, at its option, apply for Letters Patent covering the same. In the event of the failure of the Licensor to apply for Letters Patent covering such additional improvements, inventions or patentable ideas, the Licensee may apply for the same. In the event that such additional Letters Patent are applied for and are granted to the Licensor, they shall be deemed covered by the terms of this License Agreement and may be used by the Licensee hereunder without any further consideration, license fee or royalty as above provided. In the event that any such additional improvements are patented by the Licensee for use in connection with Transwrap Packaging Machines, (after the refusal or failure of the Licensor to apply for Patents thereon), the Licensor may, nevertheless, have the use but not the exclusive use of the same outside of the several territories covered by this License Agreement. The expenses of obtaining any such Patents shall be paid by the party applying therefor.

"The Licensor agrees to apply for and pay the expenses of obtaining any renewals of said Patents owned or acquired by it. The Licensee shall have the full right to use and enjoy any of the said inventions in its other machines which do not compete with Transwrap Packaging Machines and to license others so to do.

tiff promised to give the defendant an exclusive license in all territories not covered by the contract, under any patents upon improvements to the Zwoyer machine, so far as these should relate to making and closing the package. In Article XII the plaintiff promised, if it should invent any improvements to the Zwoyer machine which were suitable for use in making and closing Zwoyer packages, that it would submit them to the defendant which was given an option to apply for patents upon them. If the defendant did not exercise the option, the plaintiff might itself apply for such patents; and if the defendant took out the patents, the contract would cover them, and the plaintiff would have a license under them without further royalties. Article XIV specified those events upon which the defendant could terminate the contract. For the most part these were breaches by the plaintiff, but included were the filing of a petition by the plaintiff for reorganization under what is now Chapter X of the Bankruptcy Act , 11 U.S.C.A. § 501 et seq.,

and any court injunction of the payment of royalties.

The parties continued under the contract until January 22, 1944, when the defendant learned that the plaintiff had applied for four patents, to which in a letter written on that day it claimed the right, and of which it demanded an assignment under Article XII. The plaintiff answered on January 26th, "that there are quite a number of patents which should have been assigned to your Company. We are getting a complete list and copies of the patents for your full information." Apparently the parties had unsatisfactory negotiations before April 17, for on that day the defendant wrote the plaintiff that its failure to offer the defendant the opportunity to take out various patents was a breach of the contract which should be submitted to arbitration. This letter it followed on April 29th by another in which it said: "Because of your failure to cure the default specified in our letter of January 22, 1944, within thirty days after written notice of

but in such case the Licensee shall reimburse the Licensor for its cost in obtaining the Patents on said inventions on a basis to be agreed upon by the parties and if they fail to agree, the same shall be referred to arbitration as hereinafter provided."

"14. In the event that any one or more of the following events (herein termed events of default) shall occur and such default shall not be cured within thirty days after written notice thereof by the Licensor to the Licensee, this agreement may be terminated by the Licensor in the manner hereinafter provided.

"The following and each of the following shall constitute events of default:

"(a) Failure of the Licensee to keep true and accurate books of account;

"(b) Failure of the Licensee to permit the Licensor or its duly authorized representatives to examine and inspect the same;

."(c) Failure of the Licensee to render to the Licensor full and accurate statements in writing of all Transwrap Packaging Machines manufactured and sold by it;

"(d) Failure of the Licensee to pay the full amount of the license fees or royalties hereinabove provided for as and when the same shall be due and payable;

"(e) If the Licensee shall be adjudicated a bankrupt, or shall file a Petition under

Section 77B of the Bankruptcy Act [11 U. S.C.A. § 207], or any Act amendatory thereof, or if the Licensee shall take advantage of any bankruptcy or insolvency act;

"(f) If by reason of any action taken by or against the Licensee the payment of license fees or royalties shall be enjoined or suspended;

"(g) If the Licensee shall be dissolved or liquidated (other than in connection with a corporate reorganization and the continuance of the business of the Licensee); and

"(h) If the Licensee shall default in any of the terms, clauses, covenants and conditions of this License Agreement.

"Should such an event of default have occurred and not been cured within thirty days after written notice thereof by the Licensor to the Licensee, this license shall be deemed terminated upon a date fixed in a further written notice of termination to be sent by the Licensor to the Licensee by registered mail, which date shall not be less than ten days after the expiration of the thirty days hereinabove referred to.

"Failure of the Licensor to insist upon any of the terms, clauses, covenants and conditions of this License Agreement in any instance shall not, however, be deemed to be a waiver of default in subsequent instances."

such default, we have elected to terminate the license agreement on May 10, 1944." The plaintiff answered both these letters on May second, admitting that it was "certainly at fault in not submitting the inventions to you"; that it had "no excuses about this and can only apologize for the breach in not submitting these matters to you"; and that "nothing has happened which in any way affects the prosecution of the business, and there is nothing that is irremediable." This letter concluded that: "perhaps the settlement of this point, by making these assignments in recognition of the spirit of our agreement rather than its exact words, will meet the situation."

The plaintiff obviously changed its mind shortly thereafter, because the complaint at bar was filed on the 19th of May, 1944, and the summons was served on the 23rd. The defendant filed a counterclaim on June 15th, demanding an assignment of fourteen patents which it asserted to be within the contract, but three of which it withdrew upon the trial. The judge found that the contract was lawful throughout, not being within the doctrine of such decisions as Ethyl Gasoline Corporation v. United States, 309 U.S. 436, 60 S.Ct. 618, 84 L.Ed. 852; Morton Salt Company v. G. S. Suppiger Co., 314 U.S. 488, 788, 62 S.Ct. 402, 86 L.Ed. 363; and Mercoid Corporation v. Mid-Continent Investment Co., 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376. He dismissed the complaint, held that the plaintiff had broken the contract without excuse, that the defendant had rightfully terminated it on May 10, 1944, and he directed the plaintiff to assign to the defendant the eleven patents in question, and to disclose to the defendant all improvements upon the "Transwrap Packing Machine," in which it had any interest.

The power of a patentee to make a license conditional upon the licensee's buying other goods only of him, first came up, so far as we can find, in Heaton-Peninsular Button-Fastener Co. v. Eureka Specialty Co., 6 Cir., 1896, 77 F. 288, 35 L.R.A. 728, where the court decided that, since the patentee had power unconditionally to forbid infringement, he might attach such conditions as he chose to a license. In 1902 the Supreme Court in Bement & Sons v. National Harrow Co., 186 U.S. 70, 22 S.Ct. 747, 46 L.Ed. 1058, carried this so far as to except from the Sherman Act, 15 U.S.C.A. §§ 1-7, 15 note, patent licenses which fixed prices; and in Henry v. A. B. Dick Co., 1912, 224 U.S. 1, 32 S.Ct. 364, 56 L.Ed. 645, Ann.Cas.1913D, 880, it adopted the doctrine of Heaton-Peninsular Button-Fastener Co. v. Eureka Specialty Co., supra, 6 Cir., 77 F.Rep. 288, 35 L.R.A. 728, in full. There was a strong dissent in that case, and the dissenters had their way the next year in Bauer & Cie v. O'Donnell, 229 U.S. 1, 33 S.Ct. 616, 57 L.Ed. 1041, 50 L.R.A.,N.S., 1185, Ann.Cas.1915A, 150. The attempt which they then made to distinguish Henry v. A. B. Dick Co, supra, 224 U.S. 1, 32 S.Ct. 364, 56 L.Ed. 645, Ann. Cas.1913D, 880, was acknowledged to be futile in Motion Picture Patents Co. v. Universal Film Co., 243 U.S. 502, 518, 37 S.Ct. 416, 61 L.Ed. 871, L.R.A.1917E, 1187, Ann.Cas.1918A, 959, and the earlier decision was expressly overruled. Since then numerous decisions have held unlawful similar conditions upon a license; and in Mercoid Corporation v. Mid-Continent Co., 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376, and Mercoid Corporation v. Minneapolis-Honeywell Co., 320 U.S. 680, 64 S.Ct. 278, 88 L.Ed. 396, the doctrine was extended to the separate constituents of a patented combination; so that now it is unlawful to make a license conditional upon the licensee's purchasing only from the patentee any one of those elements of which a combination claim is composed. Indeed, it appears from the discussion in the opinions (320 U.S. at pages 669, 673, 674, 677, 680, 64 S.Ct. at pages 273, 274, 275, 276, 278, 88 L.Ed. 376), that the doctrine of contributory infringement is itself not wholly free from doubt.

The question here is whether the facts at bar fall within this doctrine. It is true that the defendant did not expressly exact as a condition upon its license under the Zwoyer patents that the plaintiff should buy anything of it; not even parts of the Zwoyer machine. Indeed, it was going out of business and could not have supplied the plaintiff, if it had exacted any such promise.

While the contract remained in execution the plaintiff was as free as possible to buy what it liked, where it liked: the parts of the Zwoyer machine, or any improvements upon it. Nevertheless, when the contract ended for any reason, the situation became quite different; as is well illustrated by the very judgment here upon appeal. The defendant has cancelled the contract for the plaintiff's breach in refusing to tender its improvement patents; and by that cancellation it has resumed control over the Zwoyer patents themselves. The mere recapture of these patents did not of course impose any limitation of the plaintiff's freedom beyond that necessarily involved in a cancellation of the license, which was of course permissible. However, in spite of the termination of the contract the defendant will remain the owner of those improvement patents which the plaintiff should transfer to it, and under these the plaintiff will no longer have any license. The question is whether that did not impose an illegal limitation, which the defendant obtained as a condition of granting a license under its own Zwoyer patents. While those patents themselves lasted, the defendant might argue that its ownership of the improvement patents could not limit the plaintiff's freedom, because the plaintiff could not sell the "Transwrap Packing Machine" without the defendant's consent anyway; and, since the improvement patents were by hypothesis improvements to that machine, any machine which embodied them must fall within the Zwoyer claims. That would indeed depend upon whether the Zwoyer claims covered those combinations of elements which were at least implied in the improvement claims; but we may assume that this would be the case. If so, the plaintiff's freedom to make, use and vend would not be impaired by the defendant's ownership of the improvement patents in addition to the Zwoyer patents. Even so, the plaintiff would lose that negative command over the art which ownership of the improvement patents would have given it. Had it not assigned these to the defendant, its own consent as well as the defendant's would have been necessary before any third person could make the improved "Transwrap Packing Machine."

Whether centering a double monopoly in the defendant's hands, instead of leaving the two parties to use their patents competitively, is an unlawful feature of the contract, we need not, however, decide, for the following reasons.

The last Zwoyer patent will expire in 1953, and the eleven improvement patents will expire between 1956 and 1959, so that there will be a period of from three to six years during which, although the plaintiff will be free to make, use, or vend the original "Transwrap Packing Machine," the defendant will be able to compel the plaintiff to buy from it alone any improved "Transwrap Packing Machine." Thus the plaintiff will be required to buy from the defendant articles which, although patented, are not covered by the Zwoyer patents. It is quite true upon the sale of its business, had the defendant not included those patents, it could have made it a condition that the plaintiff should assign to it any improvement inventions it might make, and in that way it would have secured the plaintiff as its customer for all such improvements. The owner of all property, by withholding it upon any other terms, may, if he can, force others to buy from him; land is the best example and every parcel of land is a monopoly. But it is precisely in this that a patent is not like other property; the patentee may not use it to force others to buy of him things outside its four corners. If the defendant gets the plaintiff's patents, it will have put itself in that position, in part at any rate, by virtue of the compulsion of its own patents. We do not see what difference it makes, under the decisions we have cited, whether the plaintiff is compelled to buy all improvements from the defendant by means of a transfer of the plaintiff's patents, or by means of a contract; indeed, the compulsion in the first instance is more absolute than in the second.

■ It is urged that this provision was merely an incident to the defendant's sale of its business, including the Zwoyer patents; that it could not be expected to part with that business and those patents without protection, in the event of recapture upon the buyer's default; and that it should not be compelled to take back a mutilated

business: that is, one in which it must forfeit any advances that the art had made meanwhile, advances which it was not unfair to suppose it might itself have made, had it not sold to the plaintiff. No one could have objected, had the defendant merely provided that upon recapture it should have a license for any improvements which the plaintiff had made. That would have left the plaintiff free from the defendant's control over the improved "Transwrap Packing Machine" after 1953, and yet would have relieved the defendant of the competitive handicap of being confined to the original machine. But with that the defendant was not content; on the contrary it has used the sanction of its patents to make sure that after they have expired, the plaintiff shall be at just that competitive disadvantage that it would itself have been under, if the contract had provided for its recapture of the Zwoyer patents without any license from the plaintiff to use the improvements.

We have been speaking of the period after the contract came to an end, and we do not forget that the plaintiff had an option to extend it, not only beyond the original term of ten years, but for successive periods of five years until the last of the improvement patents expired. The defendant might argue—though it has not done so—that this gave the plaintiff the opportunity to avoid the competitive handicap we have mentioned, from which it would suffer after 1953: all it need do was to keep on in the business. To this there are two answers. First, continuance in the business was not wholly within the plaintiff's power. The sales in the preceding period had to be "reasonably satisfactory" to the defendant. Moreover, if the plaintiff got into such financial straits that it must file a petition under Chapter X, it lost the contract even during the original first ten years; so too in case payment of the royalties was enjoined, whatever that meant. Second, and more important, the plaintiff was not competitively free to abandon the contract at the end of any of the periods. In 1947, when the original period would come to an end, and again in 1952 and 1957 when the next two succeeding periods would do the same, among those considerations which would certainly be influential in its decision to renew, would be the position it would be in, of which we have spoken a moment ago: i.e., that after 1953 it might feel itself forced to renew just because the improvement patents were in the defendant's hands. Moreover, that predicament might not end in 1959, the year when the last of the eleven patents in suit will expire; for these may not be the last improvements, and the plaintiff may be forced, either to cease all efforts to patent improvements, or to keep renewing the contract in order to escape the consequences of its own ingenuity. For these reasons we hold that the promise to assign the improvement patents was illegal, and cannot be enforced.

However, since the plaintiff has repudiated this promise, the defendant is excused from any further performance of any of its own promises in the contract; for the fact that the plaintiff was privileged to repudiate, does not affect that result. The contract was originally bilateral, and it does not apportion the plaintiff's promises as separate considerations for the defendant's promises; nor can we say a priori how far the promise to assign the improvement patents determined the defendant's acceptance. In such circumstances it is the rule that a promisor is excused from performance when a counter promise which is the consideration for his own promise is repudiated for illegality. Williston on Contract § 1780; Restatement of Contracts § 607. We do not know whether the contract was made in New York or Pennsylvania; but the rule is the same in both states. Foley v. Speir, 100 N.Y. 552, 3 N.E. 477; Marsell v. Maires, 203 App.Div. 646, 196 N.Y.S. 739, affirmed 236 N.Y. 516, 142 N.E. 265; Parthey v. Beyer, 228 App.Div. 308, 238 N.Y.S. 412 (semble) Sayres v. Decker Automobile Co., 239 N.Y. 73, 77, 145 N.E. 744, In Re Shannon's Estate, 289 Pa. St. 280, 137 A. 251. A different question arises as to restoration to the status quo ante—"restitution"—in a case where as here the promisee of the unlawful promise has substantially performed his own promises. Whether he may reclaim what he has given, is not necessarily governed by the same considerations that excuse his fur-

204

ther performance. This question the parties have not argued; moreover, the record is not in such form that we could finally dispose of it, if they had. The proper course will therefore be to remand the cause to the district court without attempting to do more than declare that the plaintiff's promise to assign the improvement patents is unenforceable, and that the defendant is excused from any further performance under the contract, leaving for the new trial whether the defendant may have any affirmative relief by way of restitution: if so, what that relief shall be; if not, whether the continued existence of a license under the Zwoyer patents is continued performance of a promise, or restitution; and any other questions that may turn out to be relevant.

Judgment reversed: cause remanded.

SWAN, Circuit Judge (dissenting).

When a man sells his business on terms which make it possible that he may have to buy it back, it seems to me entirely reasonable for him to require the purchaser in that event to turn over any improvement patents which have been taken out in the meantime. If the seller had no patent when he sold his business, a stipulation that patents thereafter taken out by the buyer in connection with the business should be assigned to the seller if the business was returned to him pursuant to the terms of the agreement, would in my opinion be valid—and my brother's argument does not suggest the contrary. The situation would seem to be analogous to requiring an employee to assign inventions made in the course of his employment. Guth v. Minnesota Mining & Mfg. Co., 7 Cir., 72 F.2d 385, certiorari denied 294 U.S. 711, 55 S.Ct. 506, 79 L.Ed. 1245. Even if the seller of the business owned a patent under which the buyer received a license, a stipulation that any improvement patents should belong to the licensor would formerly have been sustained. See Allbright-Nell Co. v. Stanley Hiller Co., 7 Cir., 72 F.2d 392. Recent Supreme Court cases upon which my brothers rely have established the principle that "the owner of a patent may not employ it to secure a limited monopoly of an unpatented material used in applying

the invention." Mercoid Corporation v. Mid-Continent Co., 320 U.S. 661, 664, 64 S.Ct. 268, 271, 88 L.Ed. 376. The application of that principle to the case at bar requires an extension of the doctrine to very different facts and I can see no valid reasons for so extending it. In my opinion the judgment should be affirmed.

Circuit Court of Appeals, Second Circuit.